## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DONALD TORGERSON and CHRISTOPHER LUTHER, *individually and on behalf of all others similarly situated*, | Case No. _____ |
| *Plaintiffs*, | |
| v. | **CLASS ACTION COMPLAINT** |
| CATWIG LLC d/b/a VICTORY DISABILITY, | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

Plaintiffs Donald Torgerson and Christopher Luther ("Plaintiffs"), by and through their undersigned counsel, hereby file this Class Action Complaint, individually and on behalf of all others similarly situated, against Defendant Catwig LLC d/b/a Victory Disability ("Victory" or "Defendant"). Plaintiffs base the following allegations upon information and belief, investigation of counsel, and their own personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action against Defendant for its failure to properly secure and safeguard individuals' personally identifying information ("PII") and protected health information ("PHI") including, *inter alia*, individuals' name, contact information including, address, email, or telephone number, Social Security number, date of birth and/or medical information, such as diagnosis, treatment, medications, and lab results.

2.     Businesses that handle PII and PHI owe a duty to the individuals to whom that data relates. This duty to protect PII and PHI arises because it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the affected individuals.

1

3.      The harm resulting from a data privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

4.      Victory is a law firm specializing in assisting U.S. veterans with Social Security and disability claims. [1]

5.      In order to provide these services to its clients, Defendant is entrusted with client PII and PHI. As Defendant is or should have been aware, this type of personal and sensitive data is highly targeted by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to the Class Members.

6.      In turn, Defendant has a duty to secure, maintain, protect, and safeguard the PII and PHI with which it has been entrusted against unauthorized access and disclosure through reasonable and adequate data security measures.

7.      Despite Defendant's duty to safeguard PII and PHI, Plaintiffs' and Class Members' sensitive information was exposed to unauthorized third parties during a massive data breach that took place from October 27 to November 12, 2025 (the "Data Breach"). [2]

---

[1] The HIPAA Journal, *Data Breaches Announced by Victory Disability & Madison Healthcare Services* (Dec. 16, 2025), https://www.hipaajournal.com/data-breach-victory-disability-madison-healthcare-services/.

[2] The HIPAA Journal, *supra* note 1.

8.    In the wake of the cyberattack, Defendant has begun to notify affected individuals that their valuable PII and PHI—including their full names, addresses, email addresses, telephone numbers, Social Security numbers, dates of birth and/or medical information, such as diagnoses, treatments, medications, and lab results, that was entrusted to Defendant was exposed and exfiltrated as a result of the Data Breach.[3]

9.    While Victory began to notify affected individuals of the Data Breach on December 12, 2025, it revealed very little information. To date, it is still unknown just how many individuals' PII and PHI was implicated as a result of the Data Breach.

10.    As described herein, Plaintiffs' and Class Members' PII and PHI is now in the hands of cybercriminals as a direct and proximate result of Defendant's failure to implement and follow basic security procedures.

11.    As a direct and proximate result of Defendant's inadequate data security measures, and its breach of its duty to handle PII and PHI with reasonable care, Plaintiffs' and Class Members' PII and PHI have been accessed by malicious threat actors and exposed to an untold number of unauthorized individuals.

12.    Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

---

[3] *See* 2025-12-12 Catwig LLC dba Victory Disability Data Breach Notice to Consumers (December 12, 2025), https://ago.vermont.gov/document/2025-12-12-catwig-llc-dba-victory-disability-data-breach-notice-consumers.

13.     Plaintiffs, on behalf of themselves, and the Class as defined herein, bring claims for negligence, negligence *per se*, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

14.     To recover from Defendant for these harms, Plaintiffs and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: (1) investigate and disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches of PII and PHI possessed by Defendants; and (3) provide, at Defendant's own expense, all impacted victims with lifetime identity protection services.

## PARTIES

15.     Plaintiff Donald Torgerson is an adult, who at all relevant times, is and was a citizen of the State of Minnesota.

16.     Plaintiff Christopher Luther is an adult, who at all relevant times, is and was a citizen of the State of Maine.

17.     Defendant Catwig LLC d/b/a Victory Disability is a Pennsylvania limited liability company with its principal place of business located at 255 Great Valley Parkway, Suite 150 Malvern, PA 19355.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

19.     This Court has personal jurisdiction over Defendant, as Defendant both maintains its principal place of business in Malvern, Pennsylvania and, at all relevant times, Defendant has engaged in substantial business activities in Pennsylvania, regularly conducts business in Pennsylvania, and has sufficient minimum contacts in Pennsylvania.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

**A.     Defendant Collected and Stored Plaintiffs' and Class Members' PII and PHI.**

21.     Victory is a specialized law firm "dedicated to helping Veterans across the country with Social Security Disability (SSDI) and VA disability claims."[4]

22.     Victory proudly asserts that it is "one of the nation's largest SSDI firms,"[5] has "over a decade of experience and thousands of successful clients,"[6] and "is a name Veterans trust."[7] Since 2014, it has helped "thousands of Veterans and their loved ones" across the fifty states in the country.[8]

23.     As a condition of providing these services, Defendant receives, creates, and handles the PII and PHI of Plaintiffs and Class Members.

24.     Plaintiffs and Class Members must directly or indirectly entrust Defendant with their sensitive and confidential PII and PHI in order to receive health care services, and in return

---

[4] *Home*, https://www.victory-disability.com/ (last accessed December 30, 2025).

[5] *About Us*, https://www.victory-disability.com/about-us/ (last accessed December 30, 2025).

[6] *Home*, https://www.victory-disability.com/ (last accessed December 30, 2025).

[7] *Id.*

[8] *About Us*, https://www.victory-disability.com/about-us/ (last accessed December 30, 2025).

reasonably expected that Defendant would safeguard their highly sensitive information and keep it confidential.

25.     Due to the sensitivity of the PII and PHI that Defendant handles, Defendant is aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

26.     By obtaining, collecting, and storing Plaintiffs' and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

27.     Despite the existence of these duties, Defendant failed to implement reasonable data security measures to protect the information with which it was entrusted, and ultimately allowed nefarious third-party hackers to compromise Plaintiffs' and Class Members' PII and PHI.

**B.    Defendant Knew the Risks of Storing Valuable PII and PHI.**

28.      Defendant was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

29.     Defendant also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into its highly private health information.

30.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and other healthcare partner and provider companies, including Managed Care of North America,

OneTouchPoint, Inc., Shields Healthcare Group, Eye Care Leaders and Connexin Software, Inc., and Blackbaud.

31.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

32.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[10]

33.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[11]

34.    The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now

---

[9]  Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[10]  *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end.

[11]  *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited June 5, 2024).

the biggest target for online attacks."[12] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[13]

35.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[14]

36.     Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[15]

37.     In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700

---

[12]   *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited May 31, 2024).

[13]   Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022),        https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.

[14]   *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited June 5, 2024).

[15]   *Id.*

of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[16]

38.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[17]

39.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

40.    Medical Information—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[18] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[19]

---

[16] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last visited June 5, 2024).

[17] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[18] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[19] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited June 5, 2024).

41.     Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[20]

42.     "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[21]

43.     According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

44.     Victims of healthcare data breaches may also find themselves being denied care, coverage, or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In

---

[20] Alder, *supra* note 19.

[21] *Id.*

the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[22]

45.    Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

46.    Based on the aforementioned cybercrime trends and the value of PII and PHI to cybercriminals, Defendant should have known the importance of safeguarding the PII and PHI with which it was entrusted, and of the foreseeable consequences if its data security systems were breached.

47.    Defendant had actual and constructive knowledge of the value of PII and PHI to cybercriminals, the importance of safeguarding the PII and PHI with which it had been entrusted, and the foreseeable consequences of their systems were breached. Nonetheless, Defendant failed to take adequate cyber-security measures to prevent the Data Breach from occurring.

---

[22] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

**C.    Defendant Breached its Duty to Protect Client PII and PHI.**

48.    On December 12, 2025, Defendant notified Plaintiffs and Class Members that an unknown third party obtained Plaintiffs' and Class Members' PII and PHI from Defendant's systems.

49.    The Notice Letter[23] informed Plaintiffs and Class Members that Victory was made aware of the Data Breach in November 2025. An investigation by third-party cybersecurity specialists found that from October 27, 2025 to November 12, 2025, an unknown party accessed Plaintiffs' and Class Members' PII and PHI.

50.    The notice letters, all substantively identical, inform affected individuals that their PII and PHI, such as, contact information (e.g. addresses, emails, or telephone numbers), Social Security numbers, dates of birth, and medical information, including information related to diagnoses, treatments, medications, and lab results, had been exfiltrated from Victory's information systems in the Data Breach.

51.    Many details about the Data Breach are still unknown. Neither the notice letters nor any other public statements address the manner in which cybercriminals were able to access Defendant's systems, the identity of the hackers, whether a ransom was demanded and/or paid, the number of affected individuals, or what safeguards have been put in place since the Data Breach.

52.    Although many specific details about the Data Breach (including the above) are still unknown, it is evident that bad actors accessed Defendant's computer systems in an intentional attacked designed to acquire consumers' valuable PII and PHI stored therein, and that the cybercriminals were successful in the attack.

---

[23] *See supra*, note 3.

53.     As a result of the Data Breach, the PII and PHI of at minimum thousands of individuals—including Plaintiffs and Class Members—was accessed, viewed, exfiltrated, and is now in the hands of cybercriminals.

**D.     Defendant Failed to Comply with FTC Guidelines.**

54.     Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

55.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[24]

56.     In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[25] The guidelines state that:

a.      Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b.      Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

---

[24] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited June 5, 2024).

[25] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission, October 2016, available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited June 5, 2024).

    c.    Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

    d.    Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

    e.    Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

57.    In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[26]

58.    Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.    Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to

---

[26] *See Start with Security: A Guide for Business*, Federal Trade Commission, June 2015, available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited June 5, 2024).

patients' PII and/or PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

60.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[27]

61.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[28] Upon information and belief, Defendants failed to adhere to the NIST guidance.

62.     Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare security, including implementing the following measures:

    a.     Email protection systems and controls;

    b.     Endpoint protection systems;

    c.     Identify all users and audit their access to data, application, systems, and endpoints;

    d.     Data protection and loss prevention measures;

    e.     IT asset management;

    f.     Network management;

    g.     Vulnerability management;

---

[27] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[28] *Id.* at Table 2 pg. 26-43.

      h.      Security operations center & incident response; and

      i.      Cybersecurity oversight and governance policies, procedures, and processes.[29]

63.     Upon information and belief, Defendant's failure to protect massive amounts of PII is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

64.     Defendant was well aware of their obligations to use reasonable measures to protect patients' PII and PHI. Defendant also knew it was a target for hackers, as discussed above. Despite understanding the risks and consequences of inadequate data security, Defendant nevertheless failed to comply with its data security obligations.

**E.    Defendant is Obligated Under HIPAA to Safeguard Plaintiffs' and Class Members' PHI.**

65.     Based Defendant is a covered businesses under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

66.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[30] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

---

[29] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited June 5, 2024).

[30] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

67.    HIPAA's *Privacy Rule or Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

68.    HIPAA's *Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

69.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

70.    "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

71.    HIPAA's Security Rule requires Defendant to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.    Ensure compliance by its workforce.

72.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is

required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

73.    HIPAA and HITECH also obligate Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

74.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

75.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

76.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

77.    Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

78.     Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either "(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

79.     HIPAA requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

80.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[31] The list of resources includes a link to guidelines set by the National Institute of

---

[31] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Nov. 24, 2025).

Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[32]

81.    HHS further recommends the following data security measures that regulated entities—such as Defendant—should implement to protect against some of the more common, and often successful, cyber-attack techniques:

      a.    Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

      b.    Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

      c.    Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

      d.    Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

      e.    Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[33]

82.    Upon information and belief, Defendant failed to implement one or more of the recommended data security measures.

---

[32]    https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Nov. 24, 2025).

[33]    *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dept't of Health & Human Services (Mar. 17, 2023), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

83.     While HIPAA permits healthcare providers and their business associates to disclose PHI to third parties under certain circumstances, HIPAA does not permit Business Associates or Covered Entities to disclose PHI to cybercriminals, nor did Plaintiffs or the Class Members consent to the disclosure of their PHI to cybercriminals.

84.     As such, Defendant is required under HIPAA to maintain the strictest confidentiality of Plaintiffs' and Class Members' PHI that they acquire, receive, and collect, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

85.     Given the application of HIPAA to Defendant, and that Plaintiffs and Class Members directly or indirectly entrusted their PHI to Defendant in order to receive services pertaining to their Social Security Disability and VA disability claims, Plaintiffs and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**F.      Plaintiffs and Class Members Have Suffered Damages.**

86.     For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members to suffer significant harm in several ways, including substantial and imminent risk of identity theft and fraud. Plaintiffs and Class Members must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

87.    Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

88.    As a result of Defendant's failures, Plaintiffs and Class Members face an increased risk of identity theft, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

89.    With respect to healthcare breaches, another study found "the majority [70 percent] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[34]

90.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[35]

91.    Indeed, PII and PHI are valuable commodities to identity thieves and once they have been compromised, criminals will use them and trade the information on the cyber black market for years thereafter. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security

---

[34] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTHITSECURITY,    https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last visited June 5, 2024).

[35] *Id.*

Numbers, and bank account information, complete with account routing numbers can fetch up to $1,200 to $1,300 each on the black market.[36] According to a report released by the FBI's cyber division, criminals can sell healthcare records for 50 times the price of stolen Social Security Numbers or credit card numbers.[37]

92.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[38]

93.    Health information, in particular, is likely to be used in detrimental ways, by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[39]

94.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[40]

95.    Plaintiffs and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise

---

[36] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC Media, (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[37] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[38] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH, (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[39] *Id.*

[40] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited June 5, 2024).

and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

96.     Plaintiffs and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

**G.     Plaintiff Torgerson's Experience.**

97.     Plaintiff Torgerson was a client of Defendant. To obtain assistance with the processing of his Social Security disability claim, he entrusted Defendant with his PII and PHI. In requesting and maintaining Plaintiff's PII and PHI, Defendant undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Defendant, however, did not take reasonable care of Plaintiff's PII and PHI, leading to its exposure and compromise as direct and proximate result of Defendant's inadequate data security measures.

98.     Defendant was in possession of Plaintiff's PII and PHI before, during, and after the Data Breach.

99.     Plaintiff reasonably understood and expected that Defendant would safeguard his PII and PHI. Plaintiff would not have allowed Defendant, or anyone in Defendant's position, to maintain his PII and PHI if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

100.     Plaintiff greatly values his privacy and PII and PHI and takes reasonable steps to maintain its confidentiality. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

101.     Plaintiff stores any and all documents containing PII and PHI in a secure location and destroys any documents he receives in the mail that contain any PII and PHI or that may

contain any information that could otherwise be used to compromise his identity and credit card accounts.

102.    Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

103.    Upon information and belief, as a result of the Data Breach, Plaintiff has experienced a massive increase in the number of spam calls he receives, and his information is currently on the dark web.

104.    As a result of the Data Breach, Plaintiff has spent over two hours researching the Data Breach, reviewing his bank accounts, and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

105.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress.

106.    Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

107.    Plaintiff has a continuing interest in ensuring that his PII and PHI, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

108.    As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his PII and PHI was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his PII and PHI being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect

his PII and PHI; (d) emotional distress because identity thieves now possess his sensitive PII and PHI; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his PII and PHI has been stolen and likely published on the dark web; (f) diminution in the value of his PII and PHI, a form of intangible property that Defendant obtained from Plaintiff and (g) other economic and noneconomic harm.

## H.    Plaintiff Luther's Experience.

109.    Plaintiff Luther was a client of Defendant. To obtain assistance with the application of his Social Security disability claim, he entrusted Defendant with his PII and PHI. In requesting and maintaining Plaintiff's PII and PHI, Defendant undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Defendant, however, did not take reasonable care of Plaintiff's PII and PHI, leading to its exposure and compromise as direct and proximate result of Defendant's inadequate data security measures.

110.    Defendant was in possession of Plaintiff's PII and PHI before, during, and after the Data Breach.

111.    Plaintiff reasonably understood and expected that Defendant would safeguard his PII and PHI. Plaintiff would not have allowed Defendant, or anyone in Defendant's position, to maintain his PII and PHI if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

112.    Plaintiff greatly values his privacy and PII and PHI and takes reasonable steps to maintain its confidentiality. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

113.    Plaintiff stores any and all documents containing PII and PHI in a secure location and destroys any documents he receives in the mail that contain any PII and PHI or that may

contain any information that could otherwise be used to compromise his identity and credit card accounts.

114.    Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

115.    Upon information and belief, as a result of the Data Breach, Plaintiff has experienced fraudulent attempts to charge his accounts at least 2-3 times in the past couple months.

116.    As a result of the Data Breach, Plaintiff received and continues to receive approximately 2-3 spam calls per day over the last six months.

117.    As a result of the Data Breach, Plaintiff has spent an appreciable amount of time researching the Data Breach, reviewing her bank accounts, monitoring her credit report, freezing her credit, changing her passwords, and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

118.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress.

119.    Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

120.    Plaintiff has a continuing interest in ensuring that his PII and PHI, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

121.    As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his PII and PHI was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for

fraudulent activity; (b) loss of privacy due to his PII and PHI being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his PII and PHI; (d) emotional distress because identity thieves now possess his sensitive PII and PHI; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his PII and PHI has been stolen and likely published on the dark web; (f) diminution in the value of his PII and PHI, a form of intangible property that Defendant obtained from Plaintiff and (g) other economic and noneconomic harm.

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this Class Action on behalf of themselves and all other similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

123.    Plaintiffs seek to represent the following Nationwide Class of persons defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised as a result of the Data Breach of Victory's systems detected on or about November 2025.

124.    Excluded from the Class is Defendant, its subsidiaries and affiliates, officers and directors, any entities in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

125.    This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

126.    **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiffs are informed and believe, and thereon alleges, that there are at

least hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes hundreds of thousands of individuals.

127.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a.    Whether Defendant had a duty to protect the PII and PHI of Plaintiffs and Class Members;

b.    Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' PII and PHI, and breached its duties thereby;

c.    Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d.    Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

128.    **Typicality:** Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs' and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

129.    **Adequacy:** Plaintiffs are an adequate representative of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical as explained above.

130.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class members is impracticable. This proposed class action presents

fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

131.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

132.    **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

133.    **Ascertainability:** Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Nationwide Class)

134.    Plaintiffs restate and reallege the allegations contained in every preceding paragraph as if fully set forth herein.

135.    Defendant owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

136.     Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiffs' and Class Members' PII and PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

137.     Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

138.     Defendant owed a common law duty to Plaintiffs and Class Members to implement reasonable data security measures because it was foreseeable that hackers would target Defendant's data systems, software, and servers containing Plaintiffs' and the Class's sensitive data and that, should a breach occur, Plaintiffs and Class Members would be harmed. Defendant alone controlled its technology, infrastructure, and cybersecurity. It further knew or should have known that if hackers breached their data systems, it would extract sensitive data and inflict injury upon Plaintiffs and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiffs and Class Members, was the foreseeable consequence of Defendant's unsecure, unreasonable data security measures.

139.     Defendant breached the duties owed to Plaintiffs and Class Members and thus were negligent. Defendant breached these duties by, among other things: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and

compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII and PHI.

140. But for Defendant's wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, their PII and PHI would not have been accessed and exfiltrated by cybercriminals.

141. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered injuries including:

    a.    Theft of their PII and PHI;

    b.    Costs associated with requesting credit freezes;

    c.    Costs associated with the detection and prevention of identity theft;

    d.    Costs associated with purchasing credit monitoring and identity theft protection services;

    e.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

    f.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h.    Damages to and diminution in value of their PII and PHI entrusted to Defendants with the mutual understanding that Defendants would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; and

i.    Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs and Class Members.

142.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class)

143.    Plaintiffs restate and reallege the allegations contained in every preceding paragraph as if fully set forth herein.

144.    Pursuant to Section 5 of the FTC Act, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the PII and/or PHI of Plaintiffs and Class Members.

145.    Defendant breached its duties to Plaintiffs and Class Members under Section 5 of FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII and/or PHI. Specifically, Defendant

breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with Section 5 of the FTC Act, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

146.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendants or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

147.    It was reasonably foreseeable, particularly given the growing number of data breaches of PII and/or PHI within the healthcare industry, that the failure to reasonably protect and secure Plaintiffs' and Class Members' PII and/or PHI in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendant's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted PII and/or PHI.

148.    Plaintiffs and Class Members are within the class of persons that the Section 5 of the FTC Act is intended to protect.

149.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

150.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

151.    Furthermore, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class members' electronic PHI.

152.    Defendant violated HIPAA by actively disclosing Plaintiffs' and the Class Members' electronic PHI; and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI.

153.    Plaintiffs and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients of Defendant's healthcare clients.

154.    Moreover, the harm that has occurred is the type of harm that the HIPAA was intended to guard against.

155.    Defendant's violation of HIPAA constitutes negligence *per se*.

156.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered injuries, including those identified above.

157.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiffs and the Nationwide Class)**

158.    Plaintiffs restate and reallege the allegations contained in every preceding paragraph as if fully set forth herein.

159.    Through its course of conduct, Defendant, Plaintiffs, and Class members entered into implied contracts for the provision of services, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class members' Private Information.

160.    Specifically, Plaintiffs entered into a valid and enforceable implied contract with Defendant when they first provided their PII and PHI to Defendant.

161.    The valid and enforceable implied contracts with Defendant included Defendant's implied promise to protect Plaintiffs' and Class members' nonpublic PII and PHI given to Defendant.

162.    When Plaintiffs and Class members provided their PII and PHI to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

163.    Defendant solicited and invited Plaintiffs and Class members to provide their PII and PHI as part of Defendant's regular business practices. Plaintiffs and Class members accepted Defendant's offers and provided their PII and PHI to Defendant.

164.    In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

165.    Class members reasonably believed and expected that Defendant would use part of the funds paid to it by Plaintiffs and Class members to obtain adequate data security. Defendant failed to do so.

166.    Under the implied contracts, Defendant promised and was obligated to: (a) provide services to Plaintiffs and Class members; and (b) protect Plaintiffs' and the Class members' PII and PHI provided to obtain such benefits of such services. In exchange, Plaintiffs and members of the Class agreed to pay money for these services, and to turn over their PII and PHI to Defendant.

167.    Both the provision of services and the protection of Plaintiffs' and Class members' PII and PHI were material aspects of these implied contracts.

168.    Defendant's express representations, including, but not limited to the express representations found in its Privacy Policy,[41] also memorialize and embody the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and protect the privacy of Plaintiffs' and Class members' PII and PHI.

169.    Clients of legal services seeking assistance with social security disability claims value their privacy and the ability to keep their PII and PHI associated with obtaining such services safe from unauthorized access and compromise. Plaintiffs and Class members would not have entrusted their PII and PHI to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected; nor would they have entrusted their PII and PHI to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

170.    A meeting of the minds occurred, as Plaintiffs and Class members agreed and provided their PII and PHI to Defendant and paid for the provided services in exchange for, among other things, both the provision of software services and the protection of their PII and PHI.

171.    Plaintiffs and Class members performed their obligations under these implied contracts by providing their PII and PHI to Defendant.

172.    Defendant materially breached its contractual obligation to protect the nonpublic PII and PHI Defendant gathered when the information was accessed and exfiltrated by the Data Breach.

---

[41] *Terms of Service & Privacy Policy*, available at https://www.victory-disability.com/terms-privacy/ (last accessed Dec. 30, 2025).

173.    Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Privacy Policy. Defendant did not maintain the privacy of Plaintiffs' and Class members' PII and PHI. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiffs' and Class members' PII and PHI as set forth above.

174.    The Data Breach was a reasonably foreseeable consequence of Defendant's actions and inactions in breach of these contracts.

175.    As a result of Defendant's failure to fulfill the data security protections promised, Plaintiffs and Class members did not receive the full benefit of the bargain, and instead received software and other services that were of a diminished value to that to which Defendant was contractually obligated. Plaintiffs and Class members therefore were damaged in an amount at least equal to the difference in the value of the software services with data security protection and the actual services they received.

176.    Had Defendant disclosed that its data security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiffs, Class members, nor any reasonable person would have utilized services from Defendant.

177.    As a direct and proximate result of the Data Breach, Plaintiffs and Class members have been harmed and suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their PII and PHI, the loss of control of their PII and PHI, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

178.    Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

179.    Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT/QUASI-CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

180.    Plaintiffs restate and reallege the allegations contained in every preceding paragraph as if fully set forth herein.

181.    Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they paid money to Defendant and provided Defendant with their PII and PHI. In exchange, Plaintiffs and Class members should have received from Defendant the software services that were the subject of the transaction and should have been entitled to have Defendant protect their PII and PHI with adequate data security.

182.    Defendant knew that Plaintiffs and Class members conferred a benefit on them and accepted or retained that benefit. Defendant profited from Plaintiffs' business and used Plaintiffs' and Class members' PII and PHI for business purposes.

183.    Defendant failed to secure Plaintiffs' and Class members' PII and PHI and, therefore, did not provide full compensation for the benefit the Plaintiffs' and Class members' PII and PHI provided.

184.    Defendant acquired the PII and PHI through inequitable means as they failed to disclose the inadequate data security practices previously alleged.

185.    If Plaintiffs and Class members knew that Defendant would not secure their PII and PHI using adequate data security, they would not have used Defendant's services.

186.    Plaintiffs and Class members have no adequate remedy at law.

187.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on them.

188.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and the Class members overpaid for the use of Defendant's services.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

189.    Plaintiffs restate and reallege the allegations contained in every preceding paragraph as if fully set forth herein.

190.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

191.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII and PHI. Plaintiffs allege that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

192.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

      a.      Defendant owed a legal duty to secure clients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

      b.      Defendant breached and continues to breach this legal duty by failing to employ reasonable measures to secure clients' PII and PHI.

193.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiffs' and Class Members' PII and PHI.

194.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of any of Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendant's systems occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

195.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

196.    Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiffs, Class Members, and clients whose confidential information would be further compromised.

## **DEMAND FOR JURY TRIAL**

Please take notice that Plaintiffs demand a trial by jury as to all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

1.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

2.      For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

3.      For compensatory damages on behalf of Plaintiffs and the Class;

4.      For punitive damages on behalf of Plaintiffs and the Class;

5.      For an order of restitution and all other forms of equitable monetary relief;

6.      Declaratory and injunctive relief as described herein;

7.      For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

8.      Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses;

9.      Awarding pre- and post-judgment interest on any amounts awarded;

10.     For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

11.     Awarding of such other and further relief as may be just and proper.

Dated: January 5, 2026                    Respectfully submitted,

Kenneth J. Grunfeld
**KOPELOWITZ OSTROW P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel: (954) 332-4200
grunfeld@kolawyers.com

Jason S. Rathod*
Nicholas Migliaccio*
**MIGLIACCIO & RATHOD LLP**
412 H. Street NE, Suite 302
Washington, DC 20002
T: (202)470-3520
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

*pro hac vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*